828 So.2d 894 (2001)
Ex parte Jarrell APPLETON.
(In re Jarrell Appleton v. State.
1991630).
Supreme Court of Alabama.
December 28, 2001.
*896 Wayne T. Johnson, Phenix City, for petitioner.
Bill Pryor, atty. gen., and G. Ward Beeson III, asst. atty. gen., for respondent.
JOHNSTONE, Justice.
Jarrell Appleton was convicted of first-degree robbery and was sentenced to 30 years' imprisonment. The Court of Criminal Appeals affirmed Appleton's conviction in an unpublished memorandum. Appleton v. State, 805 So.2d 788 (Ala.Crim.App. 2000) (table). The Court of Criminal Appeals also overruled his application for rehearing. Appleton petitioned this Court for a writ of certiorari, which we granted.
Appleton argues that the trial court erred in denying his motion to suppress the victim's identifications of him in a pretrial one-man showup and in court. Appleton claims that the testimony and evidence relating to the pretrial identification should have been suppressed because it derived from an unduly suggestive one-man showup. He also claims that, because the suggestiveness of the pretrial identification tainted the in-court identification, it should have been suppressed also.
The robbery victim, Vincent Flores, a taxicab driver, testified at the suppression hearing and at trial. On December 17, 1998, between 9:00 p.m. and 10:00 p.m., while Flores was using a pay phone at a service station in Phenix City to call his wife, he heard footsteps behind him. Two masked gunmen walked up behind him. The taller of the twolater identified by Flores as Appletonheld a gun to Flores's head, and the shorter robber told Flores to "give it up, give it up." Flores told the robbers that the money was in his cab, and the shorter robber searched the cab while the taller robber kept the gun to Flores's head. As he held the gun to Flores's head, the taller robber asked Flores who he was talking to, and Flores told him he was talking to his wife, who had just had a baby. The taller robber responded, "Congratulations, I'm not going to kill you." (R. 19.) That exchange was the extent of the conversation between the taller robber and Flores.
The robbery lasted only "five [to] seven minutes." (R. 23.) After the shorter robber took money from the cab, the two robbers ran toward a car parked on the street around the corner from where Flores was robbed. As soon as the robbers were out of his sight, Flores followed the robbers around the corner. He heard a door slam and tires squeak, and he saw the car speed away. At trial, Flores described the car, in which he believed the robbers fled, as a rust-colored, four-door, "early antique Ford LTD or Chevy type car." (R. 56.) Flores said that he "eyeballed" the robbers but did not see the robbers' faces because they were covered *897 by ski masks. However, he did see the robbers' clothes and pistols.
Flores testified at the suppression hearing that, about 15 minutes after the robbery, he described the robbers to the police as follows:
"They both had three-quarter length black leather coats with hoods on. The leather coats had hoods. The tall guy had a black ski mask on. He had gloves, it looked like gray, olive-type kind. Black trousers. Black boots. And held an automatic weapon, which I believe was a 45. I say it was a 45. I can distinguish the difference between a 45 and nine mill. Nine mill is smaller, so I told the guy it was a 45, and even described it was blue nickel with a brown handle."

(R. 24-25, emphasis added.) At trial, Flores further described the robbers as "black" men wearing "ski masks, three-quarter length black leather jackets with hoods, black trousers, black shoes, and ... grayish olive-type gloves." (R. 55.)
About the same time Flores was reporting the robbery, some officers responded to call from someone complaining about people loitering in the streets in an area in Phenix City. Appleton and another black man were standing on the street when the police patrol car pulled onto the street and stopped. Upon seeing the patrol car, Appleton and the other man ran. The police officers pursued the two men, followed Appleton into a wooded area, and found him hiding in a creek bed. The officers attempted to apprehend Appleton, but he resisted the officers, who subdued him by spraying him with pepper spray. The officers then searched him and found a black, nine-millimeter Beretta, fully loaded with a 15-round clip in it, and an additional 15-round clip in the pocket of his jacket. They also found a black ski mask and a black glove on Appleton. They did not find any money in his possession. The officers arrested Appleton for carrying a concealed weapon.
Shortly after the officers had apprehended and arrested Appleton, they learned that he matched the description of one of the men who had robbed Flores. Upon arriving at the police department with Appleton, the officers told Sergeant Kenneth Youngblood that they had apprehended a suspect who matched the description of one of the robbers given by Flores. Sergeant Youngblood then telephoned Flores and told him to come to the police department because they had a suspect in custody.
About 15 minutes after Flores had reported the robbery, he went to the police department to "actually identify the guy." (R. 21.) Before Flores saw the suspect (Appleton), Sergeant Youngblood showed Flores "a coat, a mask, [and] a glove, and asked him did [these] look familiar." (R. 59.) Flores testified also that Youngblood showed him a pistol which Flores identified as the .45-caliber pistol, "blue, black in color with a brown handle," which the taller robber had held to his head. (R. 59.) He told Sergeant Youngblood that the clothes and pistol looked like those belonging to one of the robbers. (R. 59-60.) Sergeant Youngblood then asked Flores whether he could identify the robbers. Flores told him that he could not identify the robbers by their physical appearances because he had not seen their faces but that he could identify them by their voices. (R. 59.) Sergeant Youngblood took Flores into a room where Appleton was sitting. Because Appleton had been sprayed with pepper spray during his apprehension by the police, he could not see Flores. Sergeant Youngblood then asked Appleton to state his name and address. Thereafter, Flores identified Appleton as one of the robbers. (R. 22.)
*898 During the suppression hearing, Flores was not able to identify Appleton as the man he had identified in the one-man showup. (R. 22.) During the trial, however, Flores did identify Appleton as the man he had identified in the one-man showup as one of the robbers.
Flores acknowledged that his pretrial identification of Appleton as one of the robbers was based primarily on his voice. (R. 28.) He acknowledged further that the pretrial identification was based also on the clothes which Sergeant Youngblood had shown him before he saw Appleton in the one-man showup. On recross-examination by defense counsel during the suppression hearing, Flores specifically testified as follows:
"Q. Mr. Flores, you first testified here this morning that you were shown some items of clothing as it matched exactly what you recall one of the robbers wearing; is that correct?
"A. That's correct, sir.
"Q. Did that lead you to believe that the police already had a pretty good hold on one of the robbers?
"A. Yes, sir.
"Q. And that was in your mind as soon as you saw the items; was it not?
"A. Well, yes, sir. The chances of any two people walking in the city wearing the same thing, the same time, the same night are a thousand to one."
(R. 28-29, emphasis added.) During the trial when defense counsel cross-examined Flores about his identification of the pistol and the clothes which belonged to Appleton, the following dialogue occurred:
"Q. Wouldn't ityour identification of this item as being the same one and these other items also as being the same ones is based upon the proximity in time. You were presented with these items to observe them at the police station shortly after the robbery took place?
"A. Yes, sir.
"Q. And it is an assumption on your part that since the police had these items at the police department, that you then assumed that these are the same ones that the robber had?
"A. Yes, sir.
"Q. Would that also go for the identification by voice?
"A. Yes, sir."
(R. 79.)
Defense counsel's cross-examination of Flores at trial and at the suppression hearing revealed differences between Flores's description of the robbers' clothes and pistols and Appleton's clothes and pistol. Although Flores testified that the taller robber wore "black" boots, Appleton's boots were rust-colored or brown. (R. 74.) Flores excused his inaccurate description on poor lighting in the area where the robbery occurred. (R. 75.) Also, Flores testified that the taller robber had a .45-caliber pistol with a blue nickel handle, even though the pistol seized from Appleton was a nine-millimeter, black Beretta. Flores testified that the taller robber wore an "olive-type gray" glove, yet Appleton's glove was black.
Sergeant Youngblood's trial testimony revealed other discrepancies between Youngblood's recollection at trial of Flores's description of the robbers and Flores's recollection at trial of his description of the robbers. Sergeant Youngblood testified that, about an hour after the robbery, "the police notified [Flores] to come to the police department concerning his robbery case." (R. 87.) When Flores arrived, Sergeant Youngblood told him that *899 the police had "a person in custody that may or may not be the person who robbed him." (R. 87.) Youngblood then questioned Flores about the robbery and asked him to describe the robbers. According to Youngblood, Flores described the taller robber as "approximately 5' 10" to 6' tall, approximately 175 to 200 pounds, wearing black pants, a black leather jacket with a hood, a black ski mask, one black glove on the hand in which the pistol was in." (R. 90.) Later, Youngblood testified that Flores told him that the taller robber wore "blue jeans." (R. 100.) According to more trial testimony by Youngblood, Flores described the pistol carried by the taller robber as a "black semi-automatic," (R. 90), and the car in which the robbers fled as "a rust-colored older model sedan, possibly a four-door Ford LTD." (R. 97.) Flores also described the shorter robber to Sergeant Youngblood.
Youngblood testified that he showed Appleton's clothes to Flores before he showed Appleton to Flores. Youngblood stated that Appleton's clothes had been removed from him when he arrived at the police department because they were wet. According to Youngblood, when he showed Flores "a black ski mask, a [black] glove, [black] pants, and a jacket," Flores identified the clothing as those worn by one of the robbers. (R. 93.) Youngblood denied that he had showed Flores the pistol recovered from Appleton. (R. 95.) Youngblood then led Flores into the room where Appleton was sitting alone, and asked Appleton to state his name and his address. At that time, about an hour after the robbery had occurred, Flores identified Appleton as one of the robbers.
On cross-examination, Youngblood stated that he did not get any other men to participate in a lineup with Appleton because the jail had been "locked down" for the night and because Appleton matched Flores's description of one of the robbers "to the tee." (R. 102.) Youngblood stated that, because he assumed from Flores's description of the size of the robbers and the clothes worn by the robbers that Appleton was indeed one of the robbers, he did not get any other men to participate in a lineup. (R. 103.) He also admitted that he did not have any other men speak so that Flores could hear other voices before making his identification of Appleton. (R. 104.)
"The United States Supreme Court has long recognized that the practice of showing a suspect singly for purposes of identification `has been widely condemned' as being unnecessarily suggestive and conducive to irreparable mistaken identifications that constitute a denial of due process. Manson v. Brathwaite, 432 U.S. 98, 104, 97 S.Ct. 2243, 2248, 53 L.Ed.2d 140, 147 (1977) (quoting Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967)). In United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Supreme Court sharply criticized suggestive pretrial identifications, such as one-man showups, calling them `[a] major factor contributing to the high incidence of miscarriage of justice from mistaken identification':
"`....
"The danger inherent in a one-man showup, where a witness is shown a single suspect and asked, `Is that the man?' is twofold. First, a one-man showup conveys a clear message that `the police suspect this man.' Williams v. State, 546 So.2d 705, 706 (Ala.Crim. App.1989) (quoting Biggers v. Tennessee, 390 U.S. 404, 407, 88 S.Ct. 979, 981, 19 L.Ed.2d 1267, 1269 (1968) (Douglas, J., dissenting) (emphasis in original)). Second, a one-man showup does not give *900 the witness a choice of identifying any other person as being the perpetrator of the crime charged. See Brazell v. State, 369 So.2d 25 (Ala.Crim.App.1978), cert. denied, 369 So.2d 31 (Ala.1979). Consequently, when a one-man showup is used to identify the perpetrator of a crime, the reliability of the witness's identification is not put to an objective test, such as a live or photographic lineup, in which a single suspect must be chosen from a group of persons possessing similar physical characteristics."
Ex parte Frazier, 729 So.2d 253, 254-55 (Ala.1998) (some emphasis in original; some emphasis added). Although a one-man showup is inherently dangerous, "it is permitted where conducted promptly after the commission of a crime or demanded by necessity, emergency or exigent circumstances." Brazell v. State, 369 So.2d 25, 29 (Ala.Crim.App.1978), cert. denied, 369 So.2d 31 (Ala.1979).
"In determining the constitutional adequacy of pretrial identification procedures and the admissibility of identification testimony, the central question is whether, under the totality of the circumstances, the identification was reliable. Manson [v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) ]. This determination involves the application of a two-pronged test. "`[T]he required inquiry is two-pronged. The first question is whether the initial identification procedure was "unnecessarily" ... or "impermissibly"... suggestive. If it is found to have been so, the court must then proceed to the question whether the procedure found to have been "unnecessarily" or "impermissibly" suggestive was so "conducive to irreparable mistaken identification" ... or had such a tendency" to give rise to a very substantial likelihood of irreparable misidentification "... that allowing the witness to make an in-court identification would be a denial of due process.' United States ex rel. Phipps v. Follette, 428 F.2d 912, 914-15 (2d Cir.1970)."
Brazell v. State, 369 So.2d at 28-29 (emphasis added). See also Donahoo v. State, 371 So.2d 68, 72 (Ala.Crim.App.1979). In evaluating the likelihood of misidentification, the court must consider the following factors:
"[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness's degree of attention, [3] the accuracy of the witness's prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation."
Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972) (emphasis added). See also Ex parte Frazier, supra. Nevertheless, "[t]he rule regarding the exclusion of pretrial identifications has been that evidence of a pretrial identification need not be excluded if the State can prove by clear and convincing evidence that the identification stems from a source independent of the unfair pretrial confrontation." Ex parte Frazier, 729 So.2d at 259.
In Ex parte Frazier, this Court held that "[t]he use of an unnecessarily suggestive one-man show up resulted in a substantial likelihood" of misidentification of Frazier as one of the robbers. 729 So.2d at 260. Thus, this Court held that Frazier's right to due process was violated by the admission of evidence of the pretrial one-man showup identification of Frazier and the in-court identification of Frazier as a robber. About three to four hours after the robbery, Frazier had been viewed by Kristie Richardson in a one-man showup *901 and identified by her as the driver of the getaway car for two other men who had robbed Richardson's friends, Kimberly Howard and Jerry Metcalf.
Richardson testified that the robbers arrived at the scene of the robbery in a "`dark color car, like a red'" car. 729 So.2d at 255. She testified further that she noticed three black men in the car and a fan in the backseat of the car. Id. Within hours of the robbery, Frazier was stopped for failing to dim his headlights. At the time of his arrest, Frazier stated that he had been driving his mother's red 1967 Chevrolet Impala earlier that night. When Richardson was summoned to the police department after the robbery, she was first shown Frazier's mother's car, the red Impala, which had a fan visible in the backseat. 729 So.2d at 257. Richardson positively identified the Impala as the car used in the robbery. After identifying the red Impala as the robbers' getaway car, Richardson viewed Frazier, handcuffed to a chair and seated alone, through a two-way mirror in a one-man showup. Richardson then identified Frazier as the driver of the Impala on the night of the robbery. 729 So.2d at 257. Richardson had not identified Frazier before the one-man showup in either a photographic lineup or a live lineup. Id.
At trial, over Frazier's objections, the trial court admitted evidence of Richardson's identification of Frazier in the one-man showup and admitted her testimony identifying Frazier in court as one of the robbers. Richardson further testified at trial that she had described the driver of the car as "a black male, in his 30s, fairly tall, and weighing about 160 pounds." The police report, however, did not state that Richardson gave the police a description of the either the car or the driver. Other than Richardson's own testimony, the record did not contain any evidence indicating how Richardson described the driver of the getaway car before she saw Frazier in the one-man showup. 729 So.2d at 258.
While the Frazier court noted that Richardson's description of the driver was "a close approximation of Frazier's actual appearance," the Frazier court observed that Richardson's general description matched the appearances of a large number of men. 729 So.2d at 259. Applying the Neil v. Biggers factors, the Frazier court found Richardson's identification of Frazier unreliable. The Frazier court stated:
"[T]his Court is not convinced that the State carried its burden of demonstrating that Richardson's testimony implicating Frazier as a participant in the robberies of Howard and Metcalf stemmed from a source other than the suggestive one-man showup in which Richardson identified Frazier as the driver of the robbers' vehicle. Considering that Richardson had had only a fleeting opportunity to see the driver, that she had paid particular attention to the presence of the car only after it had passed from her view, and the scant evidence of her prior description of the driver reveals only a generic depiction, this Court concludes that the reliability of her identification of Frazier, made after she had been exposed to an unnecessarily suggestive one-man showup, is highly questionable. Therefore, this Court holds that there was `a very substantial likelihood of irreparable misidentification' in this case."

Ex parte Frazier, 729 So.2d at 259 (citations omitted).
In Brazell v. State, supra, another robbery case involving a similar one-man showup, the Court of Criminal Appeals held that the pretrial one-man showup identification of the defendant Brazell as the robber was unduly suggestive. Nine hours after three victims were robbed, *902 they each, separately, viewed Brazell, alone, through a one-way mirror at the police department. Brazell was wearing a green shirt. Each witness identified Brazell as the robber. One of the robbery victims, ten-year-old Pam Brooks, testified that, although the police officers did not say anything to her during the showup, before the showup they told her,
"`they had seen two men hitchhiking that looked like the two men that we had described that were in the car, and they said they thought it was probably the men, so they took them to the police headquarters, and that night they called the [victims] to come up there.'"
369 So.2d at 27. Brooks testified further that the most unusual thing she remembered about the robber was that he wore a green shirt. Id. Another of the victims testified that the robber's shirt "`st[uck] out in her mind.'" 369 So.2d at 28. None of the victims described the robber in detail, although the robbery lasted about 20 minutes.
Applying the two-prong inquiry to determine the suggestiveness of the pretrial identification procedure quoted supra, the Court of Criminal Appeals found "no justification for use of the showup ... in [Brazell's] case." 369 So.2d at 29. The Brazell court held:
"Under the particular circumstances facing us, the showup was held at an unusual hour in light of the facts that the robbery had occurred nine hours earlier and that a lineup was held at 1:00 P.M. the following afternoon. Also the fact that the appellant wore a green shirt in the showup constituted an additional element of suggestiveness in the identification procedure.... [T]he totality of the circumstances, the combined and cumulative effect of these factorsthe nature of the confrontation itself, the lack of necessity for a showup, the unusual hour, and the distinctive clothingcreates an unduly suggestive identification procedure."
369 So.2d at 29. The Brazell court held further that the State presented no clear and convincing evidence that the in-court identifications of Brazell did not stem from the suggestive pretrial identifications. 369 So.2d at 30.
The first prong of a Brazell inquiry into the validity of a one-man showup is "whether the initial identification procedure was unnecessarily or impermissibly suggestive." 369 So.2d at 28 (internal quotations marks omitted). This inquiry depends on the objective characteristics of the identification procedure itself. Several characteristics of the identification procedure used in this case render it "unnecessarily or impermissibly suggestive."
First, Flores testified he went to the police station to "actually identify the guy." This testimony implies that the police had already told him they were going to show him one of the robbers.
Second, before Sergeant Youngblood showed Appleton to Flores, when Sergeant Youngblood showed Flores the jacket, mask, and a glove, Sergeant Youngblood asked Flores whether these articles "look[ed] familiar." This question suggested that Appleton was one of the robbers.
Third, Sergeant Youngblood's showing Appleton, and no one else, to Flores suggested that Appleton had been wearing the clothes and therefore had committed the robbery.
Fourth, Sergeant Youngblood's requiring Appleton, and no one else, to speak for Flores not only suggested Appleton's guilt but also omitted any control on the suggestiveness of the procedure. In other words, the absence of others than Appleton deprived Appleton of any protection against *903 Flores's assuming Appleton's guilt from the one-man showup itself and converting this assumption into an identification.
Fifth, the record reveals no necessity, emergency, or exigent circumstance to excuse Sergeant Youngblood's failure to include others of the same race and similar build in a lineup with Appleton to serve as a control on misidentification. Although the jail had been locked down for the night, the identification procedure could have been postponed until the next morning. Rather, in using a one-man showup of Appleton, Youngblood was promoting his own impression that Appleton matched Flores's pre-showup description "to the tee." (R. 102.)
The second prong of a Brazell inquiry into the validity of a one-man showup is whether the procedure, in its actual effect, was unacceptably "conducive to irreparable mistaken identification" or "had such a tendency to give rise to a very substantial likelihood of irreparable misidentification." 369 So.2d at 28 (internal quotation marks omitted). This prong depends on evidence "of a very substantial likelihood" that the witness has based his or her identification on suggestions imparted by the one-man showup instead of an independent recognition of features of the culprit present in the person in the showup.
The record before us contains too much evidence of such a likelihood for us to approve the use of Flores's identification of Appleton. First, Flores admitted in his testimony that assumptions based on Sergeant Youngblood's conduct affected Flores's identification of Appleton. Second, Appleton's accouterments, actually seized from him by the police, did not match Flores's pre-showup description. The clothes and boots seized differed in color from those described by Flores before the showup. Even more significantly, while the police seized a nine-millimeter black Beretta pistol from Appleton, Flores, who prided himself on his ability to distinguish between a nine-millimeter pistol and a .45-caliber pistol, had told the police that the weapon held by the robber who matched Appleton's stature was "a .45, ... blue nickel with a brown handle." These inconsistencies tend to prove a misidentification. Neil v. Biggers, 409 U.S. at 199, 93 S.Ct. at 382. Third, and still more importantly, Flores could not and did not, during the suppression hearing, identify Appleton as the man Flores had identified in the one-man showup.
The State bore the burden of proving "by clear and convincing evidence that [Flores's] identification stem[med] from a source independent of the unfair pretrial confrontation." Frazier, 729 So.2d at 259. The evidence in this case is palpably insufficient to meet this burden.
The unreliable one-man showup identification of Appleton tainted the in-court identification of him. The State did not present "clear and convincing evidence that the [in-court] identification [of Appleton] stem[med] from a source independent of the unfair pretrial confrontation." See Frazier, 729 So.2d at 259.
Because "the unnecessarily suggestive [pretrial one-man showup] was conducive to irreparable mistaken identification[ ] that constitute[d] a denial of [Appleton's] due process" rights, Frazier, 729 So.2d at 254, the trial court erred in admitting evidence of the showup identification of Appleton and in admitting Flores's in-court identification of Appleton. We therefore reverse the judgment of the Court of Criminal Appeals affirming the trial court, and we remand this cause to the Court of Criminal Appeals for an order or proceedings consistent with this opinion.
REVERSED AND REMANDED.
*904 SEE and WOODALL, JJ., concur.
LYONS and HARWOOD, JJ., concur specially.
MOORE, C.J., and HOUSTON, BROWN, and STUART, JJ., dissent.
HARWOOD, Justice (concurring specially).
I concur fully in the main opinion written by Justice Johnstone. I write specially simply to present the following additional matters contained in the trial transcript, which I deem to be of significance to the issues addressed by Justice Johnstone:
During the interval between the selection of, and the administration of the oath to, the trial jury and the commencement of trial proceedings in the jury's presence, the trial judge conducted a hearing on defense counsel's motion to suppress the pretrial identification of Appleton by Flores. At that hearing, Flores testified that, "less than 10 minutes after [he had reported the robbery to the police], they told me they had got somebody in the courthouse already." Accordingly, Flores "went down to the police station to actually identify the guy." "Before they let me see the guy, they showed me the equipment, and everything I described down to the shoes they had before them, to include the weapon, the type of weapon, I described and everything," all of which matched what he had described to the police. Asked by defense counsel if that led him "to believe that the police already had a pretty good hold on one of the robbers," Flores answered "Yes, sir." Next, "they brought me to the back room where they had him. He was all Maced up." Flores testified that as a result of having been "Maced," Appleton could not see him.
"And they had him say something, I don't remember what it was that he said, because one of the police officers said, `Well, if he said something would you recognize the voice.' I said most definitely, so they had him say something. I don't remember right now what he said. I said that is the guy. That's the one."
When Flores testified before the jury a short time later concerning his identification of Appleton at the police station, he explained that "they had the guy state his name and where he's from. He couldn't talk too much, but I think he said his name." (Emphasis supplied.) Sgt. Youngblood had explained to Flores that Appleton "can't see me because he was Maced up, so they asked him to state his name and he stood up and said his name. I said that's the voice."
Concerning the weapon that the robber had held at his head, Flores testified at the suppression hearing that it was a .45-caliber pistol, emphasizing that "I can distinguish the difference between a .45 and nine mil." At trial, Flores reiterated his identification of the weapon as a .45-caliber automatic, responding "yes, sir" when defense counsel asked him on cross-examination, "now, are you certain that it was a.45-caliber pistol that the taller robber had?" On several occasions during his trial testimony Flores explained that he was able to distinguish between a .45-caliber and a nine millimeter "because a.45 is bigger than a nine millimeter." He elaborated to explain that "[t]he largest automatic weapon we have right now is a.45 or .357, that's an Eagle. I mean, nobody carries those on the street. And although a nine millimeter is the preferred weapon of anybody who will try to holdup and do robberies or anything, a nine millimeter is smaller than a .45." After having testified that the police showed him the weapon before they let him look at Appleton, causing his response of "I said well, yes, that's the weapon there," Flores was *905 shown in the presence of the jury the handgun that had been taken from Appleton, and he stated that he recognized it. Asked how he recognized it, he answered, "it's a .45-caliber." He went on to say that it was the same weapon he had seen in the hands of the robber and at the police department.
The evidence is clear, however, that the weapon taken from Appleton at the time of his seizure was a nine millimeter. George Staudinger, one of the police officers who helped apprehend Appleton, testified at trial that he conducted a "patdown" and found "a black Beretta semi-automatic pistol which was loaded with 15 rounds" in Appleton's right jacket pocket. He identified State's Exhibit 11 as the "property receipt" he had filled out to inventory the items taken from Appleton, and testified that it identified "one nine millimeter semi-automatic handgun, a Beretta. It lists the model and serial number." Exhibit 11 does indeed list as one of the items seized a "9 mm semi auto handgun Beretta, model 92F # C517942." Defense counsel's cross-examination of Flores at trial elicited the following telling exchange:
"Q. You have some experience with weapons as being a veteran; is that correct?
"A. Yes, sir.
"Q. And that's how you know the difference between a nine millimeter pistol and a .45-caliber pistol; is that correct?
"A. Yes, sir.
"Q. And in your opinion, this was a.45-caliber pistol
"A. Yes, sir.
"Q. that the robber beside you has?
"A. Right, sir.
"Q. Are you certain of that?
"A. Yes, sir.
"Q. Are you as certain of that as you are of your identification of the person at the jail?
"A. Yes, sir.
"Q. If you are wrong about one, could you be wrong about the other as far as the identification of the voice?
"A. Well, that is a trick question. I suppose, but I don't think I am wrong. The weapon they showed me was, in fact, a .45."
Flores testified that he was shown the handgun at the police department before he was taken to see Appleton, but Sgt. Youngblood testified that he did not show it to him or even have it in his possession. That seeming conflict is resolved by Flores's further testimony that "the pistol that was shown to meOfficer Montezz had the pistol. He showed me a black, blue black .45 weapon, an automatic."
Flores's trial testimony contained another aspect that calls into question the reliability of his pretrial identification of Appleton. Flores had testified alternatively that the robber who held a gun to his head was wearing "black shoes" or "black boots." He was then shown by the prosecutor a pair of boots, which State's Exhibit 8, another "property receipt," identified as one pair of "Timberland [brand] boots, brown in color." Flores identified them as the footwear the robber had worn, stating that he was certain of that fact. During cross-examination, however, the following took place:
"Q. What color are these shoes here?
"A. They're rust in color.
"Q. Rust. Are they closer to
"A. Brown.
"Q. Brown or black?
"A. They are closer to brown.
"Q. Okay. They are not black?
"A. Right.

*906 "Q. Then how can you be positive that these shoes are the ones that were worn by the robber?
"A. Well, sir, it was pretty dark out there and there's no light on top of that phone where I was at and everything to me looks black, and the guy that was right on me, you know, byhow am I going to explain this. I was limited to the way I was moving my eyes so he don'tso he didn't realize what I was doing. Okay, and I guess when I took a quick glance at the shoes, I just automatically assumed they were black, or I think or I wanted to believe they were black.
"Q. I'm sorry, you wanted what?
"A. Wanted to believe they were black or I thought I saw black.
"Q. But they could have been a different color?
"A. Yes, sir.
"Q. So are you as certain of the identification of these shoes as being the same ones?
"A. Well, I gave a description of black shoes and they ain't black."
LYONS, J., concurs.
HOUSTON, Justice (dissenting).
Vincent Flores's pretrial identification of Appleton was based primarily upon the sound of Appleton's voice. No more than 30 minutes before this identification, a masked man had held a gun to Vincent Flores's head for between "five [to] seven minutes," and after saying "Congratulations, I'm not going to kill you," removed the gun and fled. I think it was for the jury to determine whether Flores could identify Appleton by his voice alone.
MOORE, C.J., and BROWN, J., concur.