Roger Dale Frazier was arrested and subsequently indicted for two counts of first degree robbery in violation of Ala. Code 1975, § 13A-8-41. On one count, the jury convicted him of first-degree robbery and on the other count it convicted him of the lesser-included offense of second-degree robbery. See Ala. Code 1975 § 13A-8-42. The circuit court sentenced Frazier under the Habitual Felony Offender Act to life imprisonment without parole on the first degree robbery conviction, and to life imprisonment without parole on the first-degree robbery conviction, and to life imprisonment on the second-degree robbery conviction. The Court of Criminal Appeals affirmed Frazier's convictions, with an unpublished memorandum. Frazier v. State,717 So.2d 896 (Ala.Crim.App. 1997) (table).
In his petition for certiorari review, Frazier alleged that his constitutional rights were violated when the circuit court allowed a State's witness to identify Frazier in court as one of the three men who committed the crimes for which he was charged. Frazier argued in his petition, as he had before the Court of Criminal Appeals, that the witness's identification was tainted by an unnecessarily suggestive pretrial one-man showup, and that the circuit court should therefore have suppressed the witness's identification from evidence. The appeals court rejected Frazier's argument, concluding that the witness's identification satisfied the five criteria for reliability set out in Neil v.Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). However, the decision of the Court of Criminal Appeals provided no analysis of the particular facts of Frazier's case, and this Court granted certiorari review to determine whether the record shows that the witness's in-court identification was indeed reliable under the Neil v. Biggers test.
The United States Supreme Court has long recognized that the practice of showing a suspect singly for purposes of identification "has been widely condemned" as being unnecessarily suggestive and conducive to irreparable mistaken identifications that constitute a denial of due process. Manson v. Braithwaite,432 U.S. 98, 104, 97 S.Ct. 2243, 2248, 53 L.Ed.2d 140, 147 (1977) (quoting Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967,1972, 18 L.Ed.2d 1199, 1206 (1967)). In United States v. Wade,388 U.S. 218, 87 S.Ct. 1926. 18 L.Ed.2d 1149 (1967), the Supreme Court sharply criticized suggestive pretrial identifications, such as one-man showups, calling them "[a] major factor contributing to the high incidence of miscarriage of justice from mistaken identification":
 "[T]he confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. . . . `The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent — not due to the brutalities of ancient criminal procedure. A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. A commentator has observed that `[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor — perhaps it is responsible for more such errors than all other factors combined.' Suggestion can be created intentionally or unintentionally in many subtle ways. And the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest.
 "Moreover, `[i]t is a matter of common experience that, once a witness has picked *Page 255 
out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may . . . for all practical purposes be determined there and then, before the trial.'"
Wade, 388 U.S. at 228-29 87 S.Ct. at 1933, 18 L.Ed.2d at 158-59
(citations omitted).
The danger inherent in a one-man showup, where a witness is shown a single suspect and asked, "is that the man?" is twofold. First, a one-man showup conveys a clear message that "the police suspect this man." Williams v. State, 546 So.2d 705, 706
(Ala.Crim.App. 1989) (quoting Biggers v. Tennessee, 390 U.S. 404,407, 88 S.Ct. 979, 981, 19 L.E.2d 1267, 1269 (1968) (Douglas, J., dissenting) (emphasis in original)). Second, a one-man showup does not give the witness a choice of identifying any other person as being the perpetrator of the crime charged. See Brazellv. State, 369 So.2d 25 (Ala.Crim.App. 1978), cert. denied.369 So.2d 31 (Ala. 1979). Consequently, when a one-man showup is used to identify the perpetrator of a crime, the reliability of the witness's identification is not put to an objective test, such as a live or photographic lineup, in which a single suspect must be chosen from a group of persons possessing similar physical characteristics.
Undisputedly, the pretrial identification of Frazier was the linchpin of the State's case against him. However, the method used to secure that identification — that is, a one-man showup — calls into question the reliability of the identification itself. If the circuit court allowed the State to use an inherently unreliable identification to secure Frazier's robbery convictions, then his right to due process was violated. If that is the case, then Frazier's convictions are due to be reversed.
Shortly before 12:50 a.m. on July 28, 1994, Kimberly Howard and Kristie Richardson were leaving a nightclub known as Charlie's Go-Go, where they worked as dancers, in Jefferson County. They were accompanied by Jerry Lamar Metcalf, who was Richardson's boyfriend at the time. It was Howard's birthday, and she had wanted to leave because she was upset over having just lost a dance contest inside the nightclub. When the three reached Howard's car in the parking lot of the nightclub, Howard, who was crying, got into her car and sat in the front seat. Richardson and Metcalf stood beside the vehicle and talked with Howard, attempting to console her. Momentarily, Richardson left Howard and Metcalf and went back toward the nightclub to retrieve Howard's birthday cake, which they had left inside.
Richardson testified that just before she left Howard's car to return to the building she saw a "dark color car, like a red" enter the parking lot. She further testified that there were three black men in the car, and that there was also a fan in the back seat. Although she could not describe the two passengers in the car, Richardson testified that she got a good look at the driver. However, Richardson later testified that she was initially unsure of the car's color because, she said, "I had only got a glimpse of it."[1]
Howard and Metcalf testified that while they were in the parking lot, an older, reddish-colored car pulled behind Howard's vehicle and two black men stepped out. They stated that the two men went to a pay telephone near Howard's car; that one of them picked up the receiver of the telephone for a couple of seconds and then slammed it down; and that then they both drew pistols and pointed them at Howard and Metcalf. Howard and Metcalf said the two men proceeded to rob them at gunpoint, while the driver of the robbers' car remained in the vehicle. Neither Howard nor Metcalf actually saw the driver of the car, however, and Metcalf testified, regarding the driver, only that the driver's voice sounded like that of a man in his 30s or upper 30s. *Page 256 
After Howard told one of the robbers that they were being videotaped by the nightclub's security camera,[2] both robbers quickly returned to the vehicle in which they had arrived, and the vehicle left the parking lot Howard then ran inside Charlie's Go-Go, screaming that she had just been robbed. Seeing Howard return, Richardson dropped Howard's birthday cake and left the nightclub to find out what had happened to Metcalf. Richardson testified that when she went outside she saw the same red car, which she had seen only a few minutes earlier, leaving the nightclub's parking lot and driving away. Outside, Richardson also found Metcalf, who was unharmed.
About 15 minutes later, a deputy from the Jefferson County Sheriff's Department responded to a call reporting the robbery. The deputy interviewed Howard, Metcalf, and Richardson, and then he completed an incident report. In that report, the deputy indicated that Howard had described the robbers' vehicle as being a brown and tan station wagon. In addition, despite the fact that Richardson testified that she told the deputy on the scene that the car she saw was dark-colored, and possibly was red, and that there was a fan inside the vehicle, nothing to that effect was reflected in the deputy's incident report. Similarly, even though Richardson later stated that she told the deputy that the driver of the car was a tall, black male who was in his 30s and who weighed approximately 160 pounds, that information was not included in the incident report. Likewise, while Metcalf stated at trial that he had described the robbers' vehicle as appearing rust-colored, his description of the car was not noted in the deputy's report. Finally, the deputy's report indicated that a fourth witness, Ronald Darty, saw the robbers' vehicle leaving the parking lot of the nightclub. Despite this, the report did not show that Darty ever gave a description of the vehicle.
Within hours after the robbery at Charlie's Go-Go, Frazier was arrested by Birmingham police and was placed in the custody of the Jefferson County Sheriffs Department.[3] Although Frazier was not driving the vehicle at the time of his arrest, he stated that he had been driving his mother's red 1967 Chevrolet Impala automobile earlier that night. Law enforcement authorities subsequently impounded the Impala, and a search revealed a fan and a .32-caliber revolver in the vehicle. Although Howard testified at trial that one of the robbers had used a revolver, she could not say for certain that the .32-caliber pistol found in Frazier's mother's car was in fact used in the robbery.[4]
Moreover, no one was with Frazier at the time of his arrest,[5]
and law enforcement authorities did not discover in his mother's vehicle any of the possessions that had been stolen from Howard and Metlcalf earlier that morning. *Page 257 
After Howard, Metcalf, and Richardson left Charlie's Go-Go, they went to the Jefferson County Sheriff's Department to give further statements regarding the robbery. When they arrived, they said the Impala belonging to Frazier's mother; it had just been impounded. When a sheriff's investigator showed them the Impala, a fan was visible in the back seat. Howard and Richardson positively identified the Impala as being the car that was used in the robbery. Metcalf said that the vehicle was probably the same car, but that he could not make a positive identification because he had seen the robbers' vehicle only out of the corner of his eye. Ronald Darty, who had also seen the vehicle used in the robberies, was apparently not asked to identify the car belonging to Frazier's mother, and the State did not call him as a witness against Frazier.
Sometime between 4:00 and 5:20 a.m., a sheriff's investigator took Richardson to view Frazier through a two-way mirror; the investigator asked her if Frazier was the man she had seen driving into the parking lot of Charlie's Go-Go just before the robbery. At the time, Frazier was handcuffed and was seated alone in a small brightly lit polygraph room in the sheriff's department. Before showing her Frazier alone behind the two-way mirror, the sheriff's investigator did not ask Richardson to identify Frazier in either a lineup or a photographic array. After seeing Frazier in the one-man showup, Richardson stated that Frazier was indeed the man she had seen driving the car into the parking lot of Charlie's Go-Go shortly before the robbery took place.
It would be mere sophistry to argue that the one-man show-up used to secure Richardson's identification of Frazier was not unnecessarily suggestive. See Brazell at 29. The record tends to show, and the State has not refuted, that there were no exigent circumstances requiring that Frazier be immediately identified by Richardson. Frazier was not apprehended in direct flight from committing a crime, and Richardson's identification of him was not made at or near the scene of the robbery. See Bates v. UnitedStates, 405 F.2d 1104 (D.C. Cir. 1968); Hobbs v. State,401 So.2d 276 (Ala.Crim.App. 1981). Also, Richardson's life was in no peril that would have required her to identify Frazier immediately. SeeStovall, supra. Furthermore, the record suggests no reason why the sheriff s investigator could not have asked Richardson to identify Frazier in a lineup or from a photographic array rather than in a suggestive one-man showup. The investigator testified that the sheriff's department, where Richardson identified Frazier, was directly across the street from the county jail, where lineups were usually held during criminal investigations conducted by the sheriff's department. Similarly, the investigator testified that he had had an opportunity to photograph Frazier before Richardson was asked to identify him, but no one attempted to assemble a photographic array for her.
However, even though the one-man showup used to secure Richardson's identification of Frazier was unnecessarily suggestive, "admission of evidence of a showup without more does not violate due process." Manson, 432 U.S. at 106,97 S.Ct. at 2249, 53 L.Ed.2d at 148 (quoting Neil v. Biggers,409 U.S. at 198, 93 S.Ct. at 382, 34 L.Ed.2d at 411). Rather, the determination of whether a pretrial showup in fact violates the due process requirement turns on "the central question [of] whether under the `totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Neil v. Biggers, 409 U.S. at 199,93 S.Ct. at 382, 34 L.Ed.2d at 411). The factors to be considered in evaluating the likelihood of misidentification, as set out inNeil v. Biggers and reaffirmed in Manson, include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Neilv. Biggers, 409 U.S. at 199-200, 93 S.Ct. at 382,34 L.Ed.2d at 411; Manson, 432 U.S. at 114, 97 S.Ct. at 2253,53 L.Ed.2d at 154.
It is undisputed that Richardson had absolutely no opportunity, during the course of the robbery, to view the men who robbed Howard and Metcalf. However, Richardson *Page 258 
testified that she saw a car, allegedly driven by Frazier, enter the parking lot of Charlie's Go-Go shortly before the robbery and leave immediately thereafter. According to Richardson's testimony, she saw the vehicle come into the parking lot, but it was only when the car was fairly close to her that the car came into sufficient light for her to see its occupants. The car apparently drove past Richardson — she estimated at about five miles per hour — and around the corner of the nightclub and out of her sight, not stopping the entire time Richardson was seeing it. Richardson testified that she got a good look at the driver as the car went past her, and that she would have been able to recognize the driver again based on her seeing him that night. However, Richardson also testified that she did not see either of the other two occupants of the car and that she was initially unsure of the color of the vehicle because, she said, "I had only got a glimpse of it." When Richardson saw the car immediately after the robbery it was already leaving the parking lot of the nightclub, so she had no further opportunity view its occupants.
Richardson testified that she turned to look at the car in the parking lot of Charlie's Go-Go because she "automatically look[ed], no matter what" when a car approached. However, she also stated that the vehicle really caught her attention only when after it had been parked, the occupants apparently did not get out of it and enter the nightclub. Of course, by the time the car was parked it was, according to Richardson's own testimony, out of her field of vision because it had already rounded the corner of the building. Thus, even though Richardson saw the vehicle as it passed by her in the parking lot, she admitted that the presence of the car did not draw her full attention until it was already past her line of sight.
Additionally, the record shows that the robbers' vehicle entered the parking lot of Charlie's Go-Go just as Richardson and Metcalf were attempting to console Howard, who was sitting in her car and crying. This set of circumstances is another factor tending to show that Richardson's attention was not fully focused on viewing persons who were in the vehicle that she saw shortly before Howard and Metcalf were robbed.
Although at trial Richardson testified in great detail as to what she saw just before Howard and Metcalf were robbed, including giving a description of the car's driver, whom she later identified as Frazier, the record reveals little evidence as to how Richardson described the driver of the car before she saw Frazier in the one-man showup at the sheriff's department. Richardson stated only once, at trial, that she had described the driver to a sheriff's deputy at the scene. She testified that she had told the deputy that the driver of the vehicle was a black male, in his 30s, fairly tall, and weighing about 160 pound. Aside from that testimony, the record contains nothing indicating that Richardson gave a description of the driver of the car to anyone before she saw Frazier in the one-man showup at the sheriff's department. In fact, the incident report completed by the deputy who interviewed Richardson at the scene of the robbery gives no indication that Richardson had described to the deputy the appearance of the driver. For that matter, even though Richardson said that she had also informed the deputy that the vehicle she saw was red and that it had a fan in the back seat, neither the incident report nor any other witness indicated that Richardson had so described the robbers' vehicle before she saw Frazier's mother's car after it had been impounded by the sheriff's department.
Because the record is nearly devoid of any evidence indicating how Richardson described the driver of the robbers' vehicle before she saw Frazier at the sheriff's department in a one-man showup, and because Richardson's testimony was not corroborated by other witnesses or by the information contained in the investigating deputy's incident report, this Court has little basis for gauging the accuracy of Richardson's prior identification relative to Frazier's actual physical appearance. Apparently, the only description supposedly given by Richardson before she saw Frazier that morning at the sheriff's department was that the driver of the car was a black male, fairly tall, in his 30s, and weighing about 160 pounds. Frazier was a black male, six feet and one inch *Page 259 
tall; at the time of his arrest he was 40 years old and weighed approximately 150 pounds. Therefore, Richardson's purported prior description of the driver was arguably a close approximation — but not an exact depiction — of Frazier's actual appearance. However, as noted by Frazier in his brief, the generality of Richardson's description probably would have described a large number of men in Jefferson County.
And finally, pertinent to the Neil v. Biggers factors, Richardson testified that she was sure that Frazier was the man she had seen driving the car at Charlie's Go-Go, and her identification of Frazier was made between three hours and four and a half hours after the robbery.
In light of these facts, this Court's analysis of the Neil v.Biggers factors leads to these conclusions:
(1) While Richasdson did have an opportunity to view the driver of the robbers' vehicle, that opportunity was a fleeting one;
(2) While Richardson noticed the robbers' car as it approached her in the parking lot of the nightclub, she did not give particular attention to the vehicle or its occupants until after it had passed from her sight, and her attention may have been diverted because she and Metcalf were attempting to console Howard;
(3) Evidence in the record regarding Richardson's describing the driver of the vehicle before she saw Frazier in a one-man showup at the sheriff's department is scant and uncorroborated. Moreover if Richardson's description of the driver as being a black male, fairly fall, in his 30s, and weighing about 160 pounds, is accepted at face value, it is nonetheless a highly generic description and not a precise depiction of Frazier's actual appearance at the time of his arrest;
(4) Although Richardson did not state a particular reason for her certainty, she did testify that she was sure that Frazier was the man she saw driving the robbers' vehicle just before Howard and Metcalf were robbed; and
(5) Although Richardson did not identify Frazier as the driver of the robbers' car immediately after Howard and Metcalf were robbed, she did identify him within a reasonably short time thereafter.
The rule regarding the exclusion of pretrial identifications has been that evidence of a pretrial identification need not be excluded if the State can prove by clear and convincing evidence that the identification stems from a source independent of the unfair pretrial confrontation. Cargill v. State, 432 So.2d 520
(Ala.Crim.App. 1983) (citing Brazell, supra); see also Wade,supra. In this present case, however, this Court is not convinced that the State carried its burden of demonstrating that Richardson's testimony implicating Frazier as a participant in the robberies of Howard and Metcalf stemmed from a source other than the suggestive one-man showup in which Richardson identified Frazier as the driver of the robbers' vehicle. Considering that Richardson had had only a fleeting opportunity to see the driver, that she had paid particular attention to the presence of the car only after it had passed from her view, and that the scant evidence of her prior description of the driver reveals only a generic depiction, this Court concludes that the reliability of her identification of Frazier, made after she had been exposed to an unnecessarily suggestive one-man showup, is highly questionable. Therefore, this Court holds that there was "a very substantial likelihood of irreparable misidentification" in this case. Neil v. Biggers, 409 U.S. at 198, 93 S.Ct. at 381,34 L.Ed.2d at 410 (quoting Simmons v. United States, 390 U.S. 377,384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968)).
Finally, this Court notes that the likelihood that Frazier was misidentified is not mitigated by Richardson's statement that she saw a fan in the back seat of the robbers' vehicle. Even though a fan was discovered in the back seat of Frazier's mother's car, the reliability of Richardson's identification of the car itself is also questionable. As was the case with her identifying Frazier in a suggestive one-man showup, Richardson was shown Frazier's mother's car in isolation at the sheriff's department after the vehicle had been impounded. When she saw the vehicle at that time, a fan was clearly visible inside the car. Moreover, the unreliability of *Page 260 
Richardson's identification of the car is compounded by these circumstances: (1) her purported prior description of the vehicle was not included in the investigating deputy's incident report, (2) the incident report reflected that Howard, who observed the robbers' car during the robbery, had previously described it as being of a model and a color different from the model and color of the car belonging to Frazier's mother, and (3) the fact that Ronald Darty, the only witness who saw the robbers' vehicle at the nightclub and was not later asked to identify Frazier's mother's 1967 Impala after it had been impounded, did not testify at trial.
The use of an unnecessarily suggestive one-man showup resulted in a substantial likelihood that Richardson misidentified Frazier. Thus, the circuit court violated Frazier's right to due process by allowing Richardson to identify him at trial. Accordingly, the judgment of the Court of Criminal Appeals is reversed, and this cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOOPER, C.J., and SHORES, KENNEDY, COOK, SEE, and LYONS, JJ., concur.
MADDOX, J., dissents.
[1] Richardson testified that the presence of a fan in the car immediately caught her attention and that it "was the first thing I saw." Later, however, Richardson stated that she had initially thought that the fan appeared to be another person in the vehicle. Similarly, Richardson testified that she did not observe the headlights of the car when she saw the vehicle in the parking lot of Charlie's Go-Go, but the record indicates that Richardson had stated previously that the car had four round headlights, which supposedly resembled those found of the defendant's vehicle. The record reveals no explanation for these apparent discrepancies.
[2] The record reveals that the nightclub did in fact have a security camera that was positioned so that it should have videotaped the entire robbery. However, the State never secured a videotape of the incident, and testimony in the record conflicts as to whether a videotape ever existed or if the tape had been automatically recorded over because no one had removed it from the security camera's recorder within 24 hours after the robbery.
[3] The details of Frazier's actual arrest are somewhat sketchy. The record is unclear as to precisely when Frazier was arrested. However, based on the testimony in the record, the time of his arrest would have to have been before 3:30 on the morning of the robbery. Also, the record contains no official report revealing the reason for Frazier's being apprehended by Birmingham police. However a pro se motion filed by Frazier in the circuit court indicated that he was stopped by police for the offense of failing to dim his headlights.
[4] Although Howard stated that she had grabbed the barrel of her assailant's handgun during the robbery, the sheriff's department's evidence technician did not attempt to lift fingerprints from the revolver found in the vehicle belonging to Frazier's mother. At trial, a sheriff's investigator testified that the evidence technician had declined to check the handgun for fingerprints because the condition of the revolver was not conducive to lifting fingerprints.
Similarly, even though one of the two men who actually robbed Howard and Metcalf had handled the telephone outside Charlie's Go-Go, the evidence technician was unable to life any fingerprints from the receiver of that telephone.
[5] The record also gives no indication that anyone else has been arrested, tried, or convicted for participating in the robberies of Howard and Metcalf.