SEE, Justice.
 

 Robert Keyon Wimes was convicted of first-degree robbery and was sentenced to 22 years’ imprisonment. The Court of Criminal Appeals affirmed that conviction in an unpublished memorandum,
 
 Wimes v. State
 
 (No. CR-06-1424, January 25, 2008), — So.3d - (Ala.Crim.App.2008) (table), and Wimes petitioned this Court for certiorari review. We granted his petition to determine whether the Court of Criminal Appeals’ decision conflicted with
 
 Ex parte Appleton,
 
 828 So.2d 894 (Ala.2001). After reviewing the parties’ arguments and the record, we quash the writ.
 

 Facts and Procedural History
 

 On November 24, 2005, Curtis Pannell’s wife dropped him off outside the bakery where he worked. As Pannell was walking around the building to the entrance, two young men approached him and demanded his wallet. Pannell refused to give it to them. One of the men had a gun and hit Pannell on the head with it. Pannell retreated into the building, and the two men ran away.
 

 Pannell’s supervisor immediately telephoned the police. When the police arrived, Pannell gave them a description of the two men. According to Officer Jonathan Whaley, who took Pannell’s statement, Pannell stated that the two men were tall and dark-skinned, that one of them was wearing a light-colored shirt and dark shorts, and that the other was wearing a black hooded jacket and blue sweatpants. Another officer, Officer Derek Womack, who was the first to respond to the call, testified that Pannell told him the dii’ection in which the young men had run.
 

 A short time after Pannell gave his statement, and within about a half hour of the actual robbery, an officer drove Pan-nell to a house where, Pannell stated, he was shown three men, one at a time,' and was asked to identify which two had been involved in the robbery. Pannell identified the two taller men, saying that the third man was too short to have been one of the robbers. The police officer testified that Pannell identified the man who he said had hit him with the gun and that he identified him by the clothes he was wearing. One of the two men Pannell identified was Wimes.
 

 At trial, Pannell identified Wimes as one of his attackers. Wimes objected to this in-court identification because, Wimes argued, the pretrial identification at the house was unnecessarily and impermissi-bly suggestive. The trial court overruled Wimes’s objection. On cross-examination, Pannell testified that it was dark where he was mugged. He further testified that he could not recall the size of the gun with which he had been hit, even though he had previously told defense counsel that it was a large gun and, apparently, had told police that it was small. Pannell further testified on cross-examination that he had described the young men to the police as tall dark-skinned individuals and that, on
 
 *133
 
 the night of the robbery, he had identified the two men by their height and their clothing.
 

 Wimes was convicted of first-degree robbery, a violation of § 13A-8-41, Ala. Code 1975,
 
 [1]
 
 was sentenced to 22 years’ imprisonment, and was ordered to pay a $5,000 fine and a $500 assessment to the Alabama Crime Victims Compensation Fund.
 

 Wimes appealed, arguing that the trial court had exceeded its discretion by allowing Pannell’s in-court identification because, Wimes argued, it was based on an impermissibly suggestive pretrial identification. The Court of Criminal Appeals affirmed the trial court’s judgment, stating in its unpublished memorandum that, under the totality of the circumstances, the pretrial identification was not impermissi-bly suggestive and the likelihood of mis-identification was low. We granted Wimes’s petition to address a possible conflict between the Court of Criminal Appeals’ decision in this case and this Court’s decision in
 
 Ex parte Appleton, supra.
 

 Analysis
 

 Wimes argues that the Court of Criminal Appeals’ affirmance of the trial court’s judgment conflicts with
 
 Ex parte Appleton
 
 because, he says, “the identification procedure involving Wimes was unnecessarily suggestive.” Wimes’s brief at 18. In
 
 Ex parte Appleton,
 
 Vincent Flores was robbed by two men while he was using a pay telephone. Both robbers were masked, and one of them held a gun to Flores’s head. The robbery lasted five to seven minutes. In describing the robbers to the police, about 15 minutes after the robbery, Flores said:
 

 “ ‘They both had three-quarter length black leather coats with hoods on. The tall guy had a black ski mask on. He had gloves, it looked like gray, olive-type kind. Black trousers. Black boots. And held an automatic weapon, which I believe was a 45. I say it was a 45. I can distinguish the difference between a 45 and a nine mill. Nine mill is smaller, so I told the guy it was a 45, and even described it was blue nickel with a brown handle.’ ”
 

 828 So.2d at 897 (emphasis omitted).
 

 About the same time Flores was reporting the robbery to the police, other officers were responding to a loitering complaint. When the officers pulled the police vehicle into the area that was the subject of the loitering complaint, Appleton and another man were standing on the street. When the pair saw the police car, they started to run. The officers chased them, and, when they caught Appleton, they found in the pocket of his jacket a nine-millimeter Beretta handgun. The officers also found in Appleton’s possession a black ski mask and a black glove.
 

 When the officers arrived at the police station with Appleton, Sgt. Kenneth Youngblood telephoned Flores and asked him to come to the station because they
 
 *134
 
 had a suspect in custody. About 15 minutes after he had reported the robbery, Flores returned to the police station to, in his own words, “ ‘actually identify the guy.’ ” 828 So.2d at 897. Youngblood showed Flores the jacket, mask, glove, and a gun, which Flores testified was a .45-caliber pistol, and asked Flores if the items looked familiar. Flores told Young-blood that they looked like the clothes the men who had robbed him were wearing and the pistol the men had used. Flores also told Youngblood that because the men who robbed him were masked, he could not identify his assailants by their faces but that he would be able to identify them by their voices. Youngblood took Flores into a room where Appleton was sitting and asked Appleton to state his name and address. From Appleton’s voice, Flores identified Appleton as the man who had held the gun to his head during the robbery.
 

 At trial, the defense argued that the manner in which the pretrial identification was conducted — showing Appleton by himself for the purposes of identification, i.e., a one-man showup — was unnecessarily and impermissibly suggestive. The trial court disagreed and denied Appleton’s motion to suppress Flores’s pretrial identification. The Court of Criminal Appeals affirmed the trial court’s judgment, and we granted Appleton’s petition for certiorari review. After reviewing the record, we agreed with Appleton and concluded that “[sjeveral characteristics of the identification procedure used in this case render it ‘unnecessarily or impermissibly suggestive.’”
 
 Ex parte Appleton,
 
 828 So.2d at 902.
 

 This Court stated:
 

 “ ‘The United States Supreme Court has long recognized that the practice of showing a suspect singly for the purposes of identification “has been widely condemned” as being unnecessarily suggestive and conducive to irreparable mistaken identifications that constitute a denial of due process.
 
 Manson v. Brathwaite,
 
 432 U.S. 98, 104, 97 S.Ct. 2243, 2248, 53 L.Ed.2d 140, 147 (1977) (quoting
 
 Stovall v. Denno,
 
 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967)).’ ”
 

 828 So.2d at 899 (quoting
 
 Ex parte Frazier,
 
 729 So.2d 253, 254-55 (Ala.1998) (emphasis omitted)). This Court continued: “ ‘In determining the constitutional adequacy of pretrial identification procedures and the admissibility of identification testimony, the central question is whether, under the totality of the circumstances, the identification was reliable.’ ”
 
 Ex parte Appleton,
 
 828 So.2d at 900 (quoting
 
 Brazell v. State,
 
 369 So.2d 25, 28 (Ala.Crim.App.1978)). Determining the reliability of a witness’s identification involves a two-pronged test:
 

 “ ‘ “The first question is whether the initial identification procedure was ‘unnecessarily’ ... or ‘impermissibly’ ... suggestive. If it is found to have been so, the court must then proceed to the question whether the procedure found to have been ‘unnecessarily’ or ‘impermissibly’ suggestive was so ‘conducive to irreparable mistaken identification’ ... or had such a tendency ‘to give rise to a very substantial likelihood of irreparable misidenti-fication’ ... that allowing the witness to make an in-court identification would be a denial of due process.”
 
 United States ex rel. Phipps v. Follette,
 
 428 F.2d 912, 914-15 (2d Cir.1970).’
 

 “Brazell v. State,
 
 369 So.2d [25] at 28-29 [ (Ala.Crim.App.1978) ].... In evaluating the likelihood of misidentification, the court must consider the following factors:
 

 
 *135
 
 “ ‘(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness’s degree of attention, (3) the accuracy of the witness’s prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.’ ”
 

 Ex parte Appleton,
 
 828 So.2d at 900 (quoting
 
 Neil v. Biggers,
 
 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (emphasis omitted)).
 

 Addressing the first prong of the
 
 Brazell
 
 test, this Court in
 
 Ex parte Appleton
 
 stated that the following facts demonstrated that the identification procedure used in that case was unnecessarily or impermissi-bly suggestive: Flores’s statement that he went to the police department to identify the robber, Youngblood’s conduct in showing Flores the clothes and asking if they looked familiar, the fact that Youngblood showed Flores only Appleton as a possible suspect and asked only Appleton to speak in Flores’s presence, and, finally, the lack of necessity or emergency justifying the one-man showup.
 
 Id.
 

 As to the second prong, this Court stated:
 

 “The record before us contains too much evidence of [a substantial likelihood of irreparable misidentification] for us to approve the use of Flores’s identification of Appleton. First, Flores admitted in his testimony that assumptions based on Sergeant Youngblood’s conduct affected [his] identification of Appleton. Second, Appleton’s accouterments, actually seized from him by the police, did not match Flores’s pre-showup description. The clothes and boots seized differed in color from those described by Flores before the showup. Even more significantly, while the police seized a nine-millimeter black Beretta pistol from Appleton, Flores, who prided himself on his ability to distinguish between a nine-millimeter pistol and a .45-caliber pistol, had told police that the weapon held by the robber who matched Appleton’s stature was ‘a .45, ... blue nickel with a brown handle.’ These inconsistencies tend to prove a misidentification.”
 

 828 So.2d at 903. This Court concluded that the unnecessarily suggestive showup was “‘conducive to irreparable mistaken identification! ]’” and that, therefore, it “ ‘constitute^] a denial of [Appleton’s] due process’ rights.”
 
 Ex parte Appleton,
 
 828 So.2d at 903 (alterations in original).
 

 Wimes argues further that the facts in
 
 Ex parte Frazier
 
 and
 
 Brazell
 
 also are analogous to the case before us. In
 
 Ex parte Frazier,
 
 Kristie Richardson testified that as she was returning to a nightclub from a parking lot, she saw a dark-colored car, possibly red, enter the parking lot. Richardson testified that there were three black men in the car and that there was a fan in the backseat. She could not describe the passengers but said that she got a good look at the driver. Richardson also testified that she was unsure about the color of the car because she “ ‘had only got a glimpse of it.’ ” 729 So.2d at 255. While Richardson was in the nightclub, her friend, Kimberly Howard, and Richardson’s boyfriend, Jerry Lamar Metcalf, were robbed at gunpoint in the parking lot by two passengers who got out of an “older, reddish-colored car.” 729 So.2d at 255. Neither Howard nor Metcalf saw the driver of the car. After the robbers left, Howard ran into the nightclub, screaming that she had been robbed.
 

 Richardson immediately left the club to check on Metcalf. Richardson testified that as she left the nightclub, she saw the same car she had seen earlier; it was
 
 *136
 
 leaving the parking lot. Fifteen minutes after the robbery, a police officer interviewed Howard, Metcalf, and Richardson. Richardson testified that she told the officer that the car she had seen was “dark-colored, and possibly was red, and that there was a fan inside the vehicle”; however, “nothing to that effect was reflected in the deputy’s incident report.” 729 So.2d at 256. She also testified that she had told the officer that the driver was a tall black male in his 30s, who weighed approximately 160 pounds, but this information was also missing from the report.
 

 Roger Dale Frazier was arrested a few hours after the robbery. Frazier stated that he had been driving his mother’s red 1967 Chevrolet Impala automobile earlier in the evening. During a search of the Impala, officers found a .32-caliber revolver and a fan. No one else was with Frazier at the time of his arrest. Howard, Metcalf, and Richardson went to the police station to give further statements regarding the robbery. When they arrived at the station, the sheriffs investigator showed them Frazier’s mother’s red Impala, which had just been impounded. A fan was visible in the backseat. Howard and Richardson identified the Impala as being the car used in the robbery. Approximately three to four hours after the robbery, the sheriffs investigator took Richardson to view Frazier through a two-way mirror. Frazier was handcuffed and seated alone in a small room at the police department. The investigator asked Richardson if Frazier was the one she had seen driving the vehicle into the parking lot of the nightclub. Richardson stated that he was the man. Frazier was convicted of one count of first-degree robbery and one count of second-degree robbery. The Court of Criminal Appeals affirmed those convictions.
 

 This Court granted Frazier’s petition for certiorari review. After concluding that the one-man showup had been unnecessarily suggestive, this Court weighed the
 
 Neil v. Biggers
 
 factors to determine whether there was a substantial likelihood of mis-identifieation. This Court stated:
 

 “[Tjhis Court’s analysis of the
 
 Neil v. Biggers[,
 
 409 U.S. 188 (1972),] factors leads to these conclusions:
 

 “(1) While Richardson did have an opportunity to view the driver of the robbers’ vehicle, that opportunity was a fleeting one;
 

 “(2) While Richardson noticed the robbers’ car as it approached her in the parking,lot of the nightclub, she did not give particular attention to the vehicle or its occupants until after it had passed from her sight, and her attention may have been diverted because she and Metcalf were attempting to console Howard;
 

 “(3) Evidence in the record regarding Richardson’s describing the driver of the vehicle before she saw Frazier in the one-man showup at the sheriffs department is scant and uncorroborated. Moreover, if Richardson’s description of the driver as being a black male, fairly tall, in his 30s, and weighing about 160 pounds, is accepted at face value, it is nonetheless a highly generic description and not a precise depiction of Frazier’s actual appearance at the time of his arrest;
 

 “(4) Although Richardson did not state a particular reason for her certainty, she did testify that she was sure that Frazier was the man she saw driving the robbers’ vehicle just before Howard and Metcalf were robbed;
 
 and
 

 “(5) Although Richardson did not identify Frazier as the driver of the robbers’ car immediately after How
 
 *137
 
 ard and Metcalf were robbed, she did identify him within a reasonably short time thereafter.”
 

 729 So.2d at 259. This Court then held that there was a substantial likelihood of irreparable misidentifieation, and it reversed the Court of Criminal Appeals’ judgment upholding the in-court identification.
 

 In
 
 Brazell,
 
 on which this Court relied in
 
 Ex parte Appleton,
 
 two men robbed at gunpoint a service station and convenience store operated by Mr. and Mrs. Lige McQueen. Pam Brooks, who was then 10 years old, was in the store during the robbery. Approximately nine hours after the robbery, the McQueens and Brooks went to the police station to view two suspects. Brooks testified that the police had told her that
 

 “ ‘they had seen two men hitchhiking that looked like the two men that we had described ..., and they said they thought it was probably the men, so they took them to police headquarters, and that night, they called us to come up there.’ ”
 

 369 So.2d at 27. The McQueens both testified that the police told them that they had two suspects for them to view but that the police did not say that they thought the suspects were the men who had robbed the service station. Each witness viewed each suspect separately, through a two-way mirror. Brazell was one of the men viewed by the witnesses. Each witness identified him as one of the robbers.
 

 Brooks testified that one of the robbers was wearing a green shirt and that that was the most unusual thing about that robber. Brazell was wearing a green shirt during the showup. Mrs. McQueen also testified that the shirt stood out in her mind. Brazell was convicted of robbery and was sentenced to 10 years’ imprisonment. He appealed the conviction to the Court of Criminal Appeals. After noting the two-pronged test for determining the reliability of a pretrial identification, the Court of Criminal Appeals stated:
 

 “It is mere sophistry to argue that the showup was not unnecessarily suggestive. A showup by its inherent nature is suggestive because the witness is given no other choices. However[,] it is permitted where conducted promptly after the commission of a crime or demanded by necessity, emergency or exigent circumstances. No justification for the use of the showup can be advanced in this case. Under the particular circumstances facing us, the showup was held at an unusual hour in light of the facts that the robbery had occurred nine hours earlier and that a lineup was held at 1:00 P.M. the following afternoon. Also, the fact that the appellant wore a green shirt in the showup constituted an additional element of suggestiveness in the identification procedure.”
 

 369 So.2d at 29. Thus, the Court of Criminal Appeals concluded, the “totality of the circumstances ... ereate[d] an unduly suggestive identification procedure.” 369 So.2d at 29.
 
 [2]
 

 We turn now to the case at hand. Wimes first argues that the Court of Criminal Appeals’ affirmance, upholding Pan-
 
 *138
 
 nell’s in-eourt identification, conflicts with
 
 Ex parte Appleton
 
 because, he says, the out-of-court-identification procedure in this case was “unnecessarily suggestive.” Wimes’s brief at 18. In
 
 Ex parte Appleton,
 
 this Court noted:
 

 “‘The danger inherent in a one-man showup, where a witness is shown a single suspect and asked, “Is that the man?” is twofold. First, a one-man showup conveys a clear message that “the police suspect this man.” Second, a one-man showup does not give the witness a choice of identifying another person as being the perpetrator of the crime charged. Consequently, when a one-man showup is used to identify the perpetrator of a crime, the reliability of the witness’s identification is not put to an objective test, such as a live or photographic lineup, in which a single suspect must be chosen from a group of persons possessing similar physical characteristics.’ ”
 

 828 So.2d at 899-900 (quoting
 
 Ex parte Frazier,
 
 729 So.2d at 254-55 (citations omitted) (emphasis omitted)).
 

 The State argues that the out-of-court-identification procedure was not impermis-sibly suggestive because (1) Pannell was shown three suspects, not just one, and (2) Pannell was shown the suspects individually and was “required to decide each suspect one at a time based upon his own recollection of who was involved in the robbery.”
 
 [3]
 
 State’s brief at 14.
 

 The showup in this case did involve three men, not just one; however, we cannot agree that Pannell’s identification was “ ‘put to an objective test.’ ”
 
 Ex parte Appleton,
 
 828 So.2d at 900 (quoting
 
 Ex parte Frazier,
 
 729 So.2d at 255). Pannell testified that he was attacked by two tall men. Only two of the three suspects presented at the showup matched that description. Therefore, we cannot say that Pannell’s identification was “‘put to an objective test ... in which a single suspect must be chosen from a group of persons possessing similar physical characteristics.’ ”
 
 Ex parte Appleton,
 
 828 So.2d at 900 (quoting
 
 Ex parte Frazier,
 
 729 So.2d at 255). Instead, we conclude that the identification procedure was unnecessarily or impermissibly suggestive.
 

 The second prong of the
 
 Brazell
 
 test requires us to address whether the “ ‘procedure found to have been “unnecessarily” or “impermissibly” suggestive was so “conducive to irreparable mistaken identification” ... or had such a tendency “to give rise to a very substantial likelihood of irreparable misidentification” ... that allowing the witness to make an in-court identification would be a denial of due process.’ ”
 
 Brazell,
 
 369 So.2d at 28-29 (quoting
 
 United States ex rel. Phipps v. Follette,
 
 428 F.2d 912, 914-15 (2d Cir.1970)). We evaluate the likelihood of mis-identification under the five factors set forth in
 
 Neil v. Biggers:
 

 “[1] [T]he opportunity of the witness to view the criminal at the time of the crime, [2] the witness’ degree of attention, [3] the accuracy of the witness’ prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.”
 

 409 U.S. at 199-200, 93 S.Ct. 375 (emphasis omitted).
 

 
 *139
 
 Wimes argues that, as in
 
 Ex pmte Appleton,
 
 the application of the
 
 Neil v. Biggers
 
 factors to the facts of this case demonstrates a substantial likelihood of irreparable misidentifieation. Specifically, as to those five factors, he argues (1) that it was dark at the time and place of the robbery and that Panned’s encounter with the robbers was brief; (2) that Panned was distracted by his injury and “was more concerned about his life than with viewing the suspects,” Wimes’s brief at 15, and that his degree of attention was therefore not great; (3) that there were inconsistencies in Pannell’s description of the robbers (namely that Officer Whaley and Officer Womack testified that Panned had described to them the clothing the robbers were wearing but that Panned testified at the hearing that he could not remember what kind of clothes he told the police the robbers were wearing, and that the police report indicated that Panned told the podce that the gun used by the robbers was small, but Panned admitted at the hearing that he had told defense counsel during a pretrial interview that the gun was large); (4) that Panned testified that he was certain that Wimes had been involved in the robbery but, Wimes argues, Pannell’s identification was based “solely upon the height of and the clothing worn by the suspects,” Wimes’s brief at 17; and (5) that only 20-30 minutes elapsed between the robbery and the showup.
 

 The State argues in response that the facts of this case, particularly as they relate to the
 
 Neil v. Biggers
 
 factors, are distinguishable from those in
 
 Ex parte Appleton, Ex parte Frazier,
 
 and
 
 Brazell.
 
 The State argues that the area in which the robbery occurred was wed lighted, that Panned interacted with the robbers face-to-face, and that he testified that he was able to give the police a “good description” of the robbers. The State also argues that Panned was attentive during the robbery and that any distractions came after he had had the opportunity to view the robbers face-to-face.
 

 The State argues that, unlike the witness in
 
 Ex parte Appleton,
 
 Panned accurately described the two suspects in the showup. The police report indicated that Panned had described the robbers as tad black males and had stated that one was wearing a light-colored shirt and dark shorts and the other was wearing a black hooded jacket and blue sweatpants. Panned also told the officers the direction in which the robbers had fled. Panned’s description matched exactly the two suspects he then identified as being involved in the robbery, and those suspects had been ap--prehended in an area in the direction in which Panned had indicated that the robbers had fled.
 

 The State further argues that “Wimes attempts to create ... discrepancies in this case by questioning Panned’s inability to describe the gun as ‘large or small’ when the police notes allegedly indicated that it was a ‘small’ gun.” State’s brief at 24. However, the State argues:
 

 “Panned did not appear to have as much knowledge regarding guns as did the victim in
 
 Appleton,
 
 [and] his descriptions of the kind and size of guns was much less certain and did not lead to any definite inconsistencies as in
 
 Appleton.
 
 Wimes’s efforts to portray Panned’s identification as inaccurate are more focused on the lack of detail in the record.”
 

 State’s brief at 25.
 

 The State argues that Panned was very certain regarding his identification of Wimes as one of the robbers. Panned testified that he was “good at seeing things” and that he was able to distinguish Wimes as the robber who did not have a
 
 *140
 
 gun during both the pretrial and the in-court identifications. The State further argues that Wimes acknowledges that Pannell was certain in his identification but then attacks the basis for that certainty, arguing that Pannell’s identification was based almost completely on the height of the suspects. Pannell’s testimony, the State argues, was that he remembered both the robbers’ heights and their clothes, and his description of the clothes “not only proved sufficiently detailed and accurate, but was the main factor in Officer Wom-ack’s making contact with the suspects.” State’s brief at 27. Finally, the State argued that only 20-30 minutes passed between the robbery and the showup, which, the State argues, provided “less likelihood that the suspects would change clothes or appearance or that Pannell’s memory would fade.” State’s brief at 28.
 

 The State would distinguish the circumstances of this case from those in
 
 Ex parte Appleton, Ex parte Frazier,
 
 and
 
 Brazell,
 
 arguing that this case is more analogous to
 
 O’Dell v. State,
 
 482 So.2d 1341 (Ala.Crim.App.1985),
 
 Dunning v. State,
 
 659 So.2d 995 (Ala.Crim.App.1994), and
 
 Gavin v. State,
 
 891 So.2d 907 (Ala.Crim.App.2003), in all of which the Court of Criminal Appeals concluded that the one-man showup was not so suggestive as to create a substantial risk of irreparable misidentification. In
 
 ODell,
 
 the victim testified that she heard a noise in her kitchen about 1:00 a.m. When she went to find the source of the noise, she saw a man standing and looking in her broken kitchen door. She screamed and the man ran away, but not before she had had several seconds in which to observe his face and upper body. She telephoned the police and gave a description of the suspect. At around 4:00 a.m., the police returned to the victim’s house with O’Dell, who matched the victim’s description. The victim identified O’Dell as the man who had tried to enter her apartment. O’Dell was convicted of attempted burglary.
 
 [4]
 

 O’Dell argued, on appeal that, under the
 
 Neil v. Biggers
 
 factors, the pretrial-identification procedure was improper. The Court of Criminal Appeals disagreed, noting: “It is apparent from the testimony of Ms. Dreaden [the victim] that she had ample opportunity to view the appellant and was ‘positive’ that he was the person who had committed the crime.” 482 So.2d at 1345. The Court of Criminal Appeals further noted that the victim’s testimony indicated that there was a bright light on in the kitchen when she saw the perpetrator, as well as lights on outside the kitchen door and that she “ ‘got a full look at [the appellant’s] face.’ ” 482 So.2d at 1346. The Court of Criminal Appeals concluded:
 

 “Under the facts presented by Ms. Dreaden’s testimony, all five of the
 
 [Neil v. ]Biggers
 
 factors were established. That is, Ms. Dreaden testified that she had the opportunity to observe the appellant at the time of the crime; that she was alert and observed the appellant; that she was subsequently able to describe the appellant; and that she was certain of the identity of the appellant when the police brought him to her later that evening. After considering these factors, we conclude, as this court in
 
 Glass v. State,
 
 424 So.2d 687, 690 (Ala.Crim.App.1982), concluded, that the identification of the appellant as the person who had committed the crime was ‘highly reliable.’ In the present case, the pretrial confrontation was not so impermissibly suggestive that it created a ‘substantial risk of misidentification,’ and thus the identification was proper.”
 

 
 *141
 
 482 So.2d at 1346-47 (quoting
 
 Jackson v. State,
 
 414 So.2d 1014, 1018 (Ala.Crim.App.1982)).
 

 In
 
 Dunning,
 
 Odessa Jones was at home with her four children when she heard someone coming through her front door. As she entered her living room, she saw two men with guns coming in the front door. Another man with a gun came in the back door. One of the men, whom Jones later identified as Dunning, began shouting at Jones, asking her for money he said her brother owed him. Jones was unable to find the money in the house and suggested that it might be in her brother’s car. Dunning went out to the car to look for the money, taking Jones’s 12-year-old daughter Valencia with him. Jones and the other children stayed in one of the bedrooms. After about 20 minutes, Jones left the bedroom to look for Valencia. In the meantime, Dunning had left, and Valencia had gone to a neighbor’s house to telephone the police. Dunning was apprehended by a police officer who was en route to Jones’s house. The officer took Dunning to Jones’s house, and Jones identified Dunning as one of the robbers.
 

 Dunning was convicted of robbery in the first degree and was sentenced to 25 years’ imprisonment. He appealed his conviction, arguing, among other things, that Jones’s identification of him was the result of a suggestive one-man showup. The Court of Criminal Appeals stated:
 

 “Here, Officer Barnwell observed the appellant running from the general area of Jones’s house immediately after receiving the call regarding a burglary in process. Odessa Jones had ample time to observe the appellant while he was in her house. Officer Barnwell brought the appellant to Jones’s house and she identified the appellant as one of the robbers within minutes of the robbery. ... The victim’s identification was reliable and the circumstances surrounding the identification were not impermissibly suggestive.”
 

 Dunning,
 
 659 So.2d at 998.
 

 In
 
 Gavin,
 
 Dewayne Meeks testified that he and his cousin, Keith Edmund Gavin, drove to Chattanooga, Tennessee, for Gavin to meet a certain woman. When the woman did not appear at the agreed location in Chattanooga, Meeks and Gavin drove to Centre, Alabama, to find her. Meeks testified that while he and Gavin were stopped at an intersection in downtown Centre, Gavin got out of the car and approached a van that was parked nearby. Meeks testified that he saw Gavin fire two shots at the driver of the van. Meeks testified that he fled as soon as he saw Gavin shoot the driver and that Gavin got in the van and followed him. Meeks testified that he did not stop until he got to Chattanooga.
 

 Investigator Danny Smith of the district attorney’s office testified that he heard the report of the shooting over the radio. As he proceeded toward Centre, he saw a van matching the description of the van involved in the shooting. He followed the van and contacted law enforcement on his radio. Smith testified that after he put on his emergency lights, the van stopped in the middle of the road, and the driver got out, turned, and fired a shot at him. Smith testified that the driver then ran in front of the van, turned and fired another shot at him, and ran into the woods. Smith described the driver of the van as “black, ... wearing a maroon or wine-colored shirt, blue jeans, and some type of toboggan or other type of cap.” 891 So.2d at 929. The police eventually caught Gavin, and Smith went to the jail so that “he could ‘look at the suspect that they had in custody to make sure that they, in fact, had the right person.’ ” 891 So.2d at 958. Smith positively identified Gavin as the
 
 *142
 
 person who had been driving the van and who had shot at him.
 

 Gavin was convicted of capital murder for killing the driver of the van. On appeal, he argued, among other things, that the one-man showup in which Smith identified him was impermissibly suggestive. The Court of Criminal Appeals disagreed, noting that Smith’s testimony indicated that his identification of Gavin was “not based on any preconceived notion that the person the police had in custody was, in fact, the person who had shot at him, but rather, was a precautionary measure to ensure that the right man was in custody.” 891 So.2d at 960. The Court of Criminal Appeals went on to say that “even assuming that the showup was unnecessarily and impermissibly suggestive,” it concluded that “the likelihood of mis-iclentification was low.” 891 So.2d
 
 at 961.
 
 The Court of Criminal Appeals based this conclusion on the following analysis of the
 
 Neil v. Biggers
 
 factors: (1) that Smith had ample opportunity and sufficient light by which to view Gavin and that Gavin had shot at him; (2) that Smith’s degree of attention was very high, particularly considering his training as a law-enforcement officer; (8) that Smith’s description of Gavin was detailed and accurate;
 
 [5]
 
 (4) that Smith testified that he was positive in both his pretrial identification and his in-trial identification of Gavin as the man who was driving the van and who had fired the gun at him; and (5) that.a little over three hours had passed between the crime and the identification. 891 So.2d at 961-62. The Court of Criminal Appeals then concluded that “[u]nder the circumstances, ... the trial court did not err in allowing Investigator Smith’s identification testimony.” 891 So.2d at 962.
 

 Although we acknowledge that there are factual differences between this case and each of the other cases cited by Wimes and by the State, we agree with the State that the facts of this case make it more analogous to
 
 O’Dell, Dunning,
 
 and
 
 Gavin
 
 than to
 
 Ex parte Appleton, Ex parte Frazier,
 
 and
 
 Brazell.
 
 We further agree that under the totality of the circumstances presented in this case, there was not such a substantial likelihood of irreparable misidentification as to deprive Wimes of due process.
 
 See Ex parte Appleton,
 
 828 So.2d at 900.
 

 First, like the witnesses in
 
 ODell, Dunning,
 
 and
 
 Gavin,
 
 Pannell viewed his assailants face-to-face. Although he testified that it was dark at the time of the robbery, he stated that it was not so dark that he could not “pick out facial features.” Pan-nell also testified that he was able to give the police a good description of the robbers. The police report indicates that Pannell described one of the robbers as wearing a black hooded jacket and blue sweatpants. Thus, it appears that the area in which the robbery occurred was sufficiently lighted so that Pannell could distinguish between those two similar colors. Similarly, Smith, the officer in
 
 Gavin,
 
 testified that it was dark and raining at the time that Gavin shot at him but that the light from the car’s headlights was sufficient to enable Smith to tell law enforcement that Gavin was wearing jeans and to describe the specific color of Gavin’s shirt.
 

 
 *143
 
 Second, like the victims in
 
 O’Dell
 
 and
 
 Dunning
 
 and the officer in
 
 Gavin,
 
 Pannell was attentive during the robbery. He testified: “I’m pretty good at seeing things, especially things in front of me, especially this land of a situation that happened like this here. ... I did give a good description of them.” Wimes argues that Pannell was distracted by his injury, but, as the State notes, Pannell’s injury did not occur until after he had seen and spoken with the robbers face-to-face.
 

 Third, unlike the victim’s description in
 
 Ex parie Appleton,
 
 Pannell’s description of his assailants was accurate. Wimes argues that, as in
 
 Ex parte Appleton,
 
 there was an inconsistency in Pannell’s description of the gun. However, Pannell, unlike the victim in
 
 Ex paite Appleton,
 
 did not profess to be able to distinguish between types of guns or testify with certainty as to the size or type of the gun. Moreover, none of suspects shown to Pannell for identification was found with a weapon. Therefore, unlike the identification made in
 
 Ex parte Appleton,
 
 in which the victim used a gun to identify his attacker, these alleged inconsistencies are irrelevant. We conclude, as did the Court of Criminal Appeals in
 
 Gavin,
 
 that this inconsistency does not “undermine [Pannell’s] otherwise accurate description of [Wimes].”
 
 See Ex parte Gavin,
 
 891 So.2d at 961.
 

 Fourth, Wimes, like the witnesses in
 
 O’Dell, Dunning,
 
 and
 
 Gavin,
 
 was cei’tain of his identifications — both pretrial and in-court. He testified with certainty that Wimes was one of the robbers and, moreover, that Wimes was the robber who was not carrying a gun. Although Pannell’s testimony on cross-examination indicated that much of his identification was related to the height of his assailants, he did state that he identified his assailants based on their clothes as well. When asked whether “there [was] any question in [his] mind when [he] saw [Wimes] that he was one of the persons that robbed [him],” Pannell responded: “There was no question in mind.”
 

 Finally, only 20-80 minutes passed between the time of the robbery and Pan-nell’s identification of Wimes as one of the robbers.
 

 In light of these facts, we hold that, under the totality of the circumstances, the identification in this case, like those in
 
 O’Dell, Dunning,
 
 and
 
 Gavin,
 
 was sufficiently reliable and that the identification procedure did not violate Wimes’s due-process rights. We further conclude that
 
 Ex parte Appleton
 
 is distinguishable on that ground and that there is therefore no conflict between
 
 Ex parte Appleton
 
 and the decision of the Court of Criminal Appeals in this case. We, therefore, quash the writ of certiorari.
 

 Conclusion
 

 Pannell’s pretrial identification of Wimes was not so “ ‘ “ ‘conducive to irreparable mistaken identification’ ... or had such a tendency ‘to give rise to a very substantial likelihood of irreparable misidentification’ ... that allowing the witness to make an in-court identification would be a denial of due process.” ’ ”
 
 Ex parte Appleton,
 
 828 So.2d at 900 (quoting
 
 Brazell v. State,
 
 369 So.2d at 28-29, quoting in turn
 
 United States ex rel. Phipps v. Follette,
 
 428 F.2d at 914-15). Therefore, we quash the writ in this case.
 

 WRIT QUASHED.
 

 COBB, C.J., and LYONS, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
 

 MURDOCK, J., concurs in the result.
 

 WOODALL, J., dissents.
 

 [1]
 

 . Section 13A-8-41 provides, in pertinent part, that "[a] person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he: (1) is armed with a deadly weapon or dangerous instrument.”
 

 Section 13A-8-43, Ala.Code 1975, provides, in pertinent part:
 

 "A
 
 person commits robbery in the third degree if in the course of committing a theft he:
 

 "(1) Uses force against the person of the owner or any person present with the intent to overcome his physical resistance or physical power of resistance; or
 

 "(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property.”
 

 [2]
 

 . The Court of Criminal Appeals did not address the second prong of the
 
 Brazell
 
 test. It concluded that the record did not contain enough evidence of the
 
 Neil
 
 v.
 
 Biggers
 
 factors to enable the court to determine whether the in-court identification was based on the suggestive pretrial-identification procedures or on an independent basis. Therefore, the Court of Criminal Appeals “remandfed] the conviction of the appellant to the trial court for a hearing to determine whether the in-court identifications had an independent basis or source.” 369 So.2d at 30.
 

 [3]
 

 . The Slate argues that Wimes did not address this prong in his brief. Although Wimes does not address this prong separately, he does state that the identification procedure was unnecessarily suggestive. Wimes’s brief at 18. Wimes also provides some discussion of this prong in his discussion of this Court’s decision in
 
 Ex parte Appleton,
 
 Wimes’s brief at 9, and the Court of Criminal Appeals' decision in
 
 Brazell.
 
 Wimes's brief at 13-14.
 

 [4]
 

 . O'Dell was also convicted of two counts of burglary in the third degree and theft of prop-crty in the second degree with regard to property taken from other locations.
 

 [5]
 

 . The Court of Criminal Appeals noted a discrepancy in Smith's description of the gun Gavin fired at him. Smith stated “that based on the 'thickness' of the gun as he saw it, he believed, but ‘wasn’t sure,’ that Gavin had a revolver, when, in fact, the weapon found was a .40 caliber semiautomatic pistol.” 891 So.2d at 961 (citation to record omitted). Nevertheless, the Court of Criminal Appeals concluded: “[W]e do not believe this discrepancy undermines Investigator Smith’s otherwise accurate description.” 891 So.2d at 961.